WALTER M. ELSWICK, Judge.
The claimant, Gilbert Reed, is the owner of a valuable farm lying on each side of the Little Kanawha river near the Brax-ton-Gilmer county line at Gilmer Station, Gilmer county, West Virginia, containing about three hundred acres. Two-thirds or more of the farm lays across the Little Kanawha river from the state road route No. 35 (now known as route No. 5). In the year 1938 the state road commission sponsored the construction of a new bridge at 1/16 of a mile below the Reed farm, known as the Gilmer bridge, spanning the Little Kanawha river connecting with a road leading from the state road across the river to the Gilmer Station side of the river so that this road would run near the farm owned by claimant. On October 1,1938, the claimant entered into an agreement with the state road commission whereby he agreed that the state road commission could quarry one thousand cubic yards of stone from an Undeveloped quarry site on his lands for the construction-of project “Gilmer *220 bridge, route Copen Run, Glenville district, Gilmer county, West Virginia, said quarry site being located at the mouth of Long Shoal run, Braxton county.”
The consideration for the payment of said stone is recited in the agreement as being the sum of one dollar ($1.00), cash in hand paid, and of the further consideration that the state road commission agreed to deposit surplus waste materials from quarry at junction of Long Shoal Run road and state road route 35; also to install forty (40) feet of culvert at said junction of Long Shoal Run road and state road route 35, and to reset fence along quarry site after quarry is abandoned; the state road commission further agreed to remove waste from barn lot below quarry site to a depth of three and one-half (3Vz) feet on upper side and slope toward run; also to preserve spring near upper end of quarry. The contract further provided that the road commission should have ingress and egress to and from the Reed lands at convenient points with machinery and equipment necessary for the proper construction of the work in said quarry and could operate said machinery and equipment over, on and across said lands at points deemed convenient to the road commission, for the purpose of quarrying, blasting, crushing, stocking, handling, loading and removing of stone from quarry.
The agreement further specifies that the sum of one dollar ($1.00) therein designated, shall constitute full, final and complete payment for the stone quarried from said quarry and used for construction purposes, as well as full, final and complete payment for all damages of every nature whatsoever and all damages to residue of property which may result to the said claimant, by reason of the operation of said stone quarry and removal of stone to point or points of application where needed.
The claimant asserts that he has suffered damages to his said farm, beyond the special and peculiar benefits received, by reason of the manner of the work done, namely: First, that the state road commission, by its agents, changed the quarry site, without any additional agreement; second, that approximately *221 5’jQ cubic yards of stone was quarried, of which amount about 250 cubic yards were used in the construction of the Gilmer bridge, after which ro further stone was used out of said quarry in the construction - N-v. ■>. remaining abutments of said bridge being eo . ea ooi of concrete, and that claimant notified th:. '^cnis ¡. . hi state road cm..mission, in charge of said project, not to k ove the stone renaming in said quarry which had been quarried but not used, but that said stone was removed from his lands to a place on the Copen Run road at or near the mouth of Copen Run, and that claimant r-as the o ier of said stone so removed; third, that the amount oí asee * aerial deposited at the junction of Long Shoal Run and state road route No. 35 was insufficient for the purpose of a barn site; fourth, that most of said waste stone and material was trucked out to the mouth of Copen Run and used on state road route No. 35 at several places for side ditches; fifth, that the fence along quarry site near and on the upper side of Long Shoal Run was not reset by the state road commission; sixth, that a sufficient wall around the spring near quarry site was not made, but on the contrary the state road commission laid up a loose rock wall which did not preserve the spring; seventh, that the fence around the barn lot was torn out by the state road commission and never replaced; and eighth, that the right-of-way of the Long Shoal Run road was changed so as to place it higher above the run, thereby using a strip of land owned by claimant 200 feet long and 20 feet wide, under a verbal agreement that said new road would be filled in level with state road route No. 35, running at right angles thereto, which roadway was changed but not filled level with said state road route No. 35, nor substantially so, and that the fence above said road was not replaced.
As to the first assertion of damages pertaining to change of quarry site it appears from the evidence that all of the 500 cubic yards of stone were quarried near the mouth of Long Shoal Run in accordance with said agreement with an intervening space of about 200 feet (record p. 36). Claimant says that he saved some of the stone on the point from the mouth of *222 Long Shoal Run for his individual use (record p. 10) but there is no reservation in the agreement to sustain this contention. It further appears from the evidence that the claimant agreed to this change or extension of the quarry in consideration of receiving some of the stone squared up for him, which he received. (Record pp. 10, 37 and 60).
As to the second assertion of damages that claimant was the owner of the stone which had been quarried and which was removed from his farm and not used in the construction of the Gilmer bridge, it appears from the evidence, and the agreement which claimant entered into with the road commission, that claimant was vitally interested in the construction of said Gil-mer bridge, for if this bridge had not been constructed by the state road commission he would not have had any outlet to two-thirds or more of his farm across the river from the state road except to. ford the river, which was impossible (record pp. 5 and 29). It further appears from the evidence that the price of stone in the quarry to be made into cut stone would be from 25 cents to 50 cents per cubic yard, varying as to quality and proximity to project (record pp. 112,113,127), and that the price of man stone in the quarry or on the surface would be from three to ten cents per yard (record p. 127). These prices are mentioned to show the actual value of the stone quarried and taken from claimant’s land. No stone had been quarried on this land prior to the quarrying done by the state road commission and the stone proved to be of poor quality with a large amount of waste and man stone to handle. (Record pp. 112, 113, 124 and 139).
Claimant was also interested in having a fill made on his land at the junction of Long Shoal Run road and state road route No. 35 to furnish him with a foundation for a barn site above the high water level since the old barn which he had on that side of the river was flooded when there was a rise in the river. These were the major factors involved as a consideration for the state road commission to quarry the stone (record pp. 17 and 29). The contract provided that the surplus waste material *223 from quarry was to be deposited on this barn site. It appears from the evidence that the state road commission did make a fill from six to seven feet high on said barn site level with or higher than the road (record pp. 138 and 187) and claimant has since constructed a barn on this fill 34 feet by 50 feet foundation dimensions (record p. 18) with the fill extending 24 feet from the bam to .the edge of state route No. 35 (record p. 88). There was an old culvert extending 40 feet from the junction of the Long Shoal F,an road and state road route No. 35 which was placed below the drain level (record p. 53) and the state road commission installed 100 feet of culvert through the fill with the drain level. The agreement had specified that 40 feet of culvert requested by the claimant was to be installed, but this 40 feet would have extended up to the bam site and the additional 60 feet of culvert pipe was furnished and laid by the state road commission at claimant’s request in order to have same extended beyond his barn site (record p. 159). There was more waste material dumped for the fill and the fill extended further than ivas expected when the contract was drawn, which required the culvert to be extended to the end of the fill. (Record pp. 52, 139 and 159). This additional 60 feet of culvert pipe cost $1.00 per foot.
It appears from the contract that there was no specific requirement as to how high the fill should be made, except that surplus waste material was to be deposited at the site designated. Ordinarily waste material from a quarry would not he considered as cut stone or man stone, and especially so since it appears from the evidence that the man stone quarried and placed at the highway was worth $4.10 per cubic yard (record P-63).
It further appears from the evidence that after the state road commission had completed the Gilmer bridge the claimant requested the commission officials to clean up the quarry site including the removal of cut stone and man stone from the quarry site (record pp. 11 and 12). It does not appear from the evidence that claimant at that' time as much as proposed to *224 take the stone quarried for the costs and expenses of the cleanup. The road commission expended a total sum of $501.60 in this cleanup and haul, dredging and straightening the channel of Long Shoal Run through claimant’s property and constructing a wall around the spring. (State’s exhibit No. 9).
It further appears from the evidence that in addition to the surplus waste material piled in said fill at said barn site at the junction of said roads, the state road commission, at the request of the claimant, hauled from said quarry site and placed on said fill from 175 to 225 cubic yards of man stone in February 1941; that from this fill made by the road commission, claimant took therefrom and sold approximately 175 cubic yards of man stone at a net profit of $4.10 per cubic yard or $717.50 (record pp. 46 and 63). There was considerable evidence introduced to show that 56 cubic yards of man stone was hauled to the opposite side of the Gilmer bridge and stacked there, but it appears from the evidence that this stone was used in making fills for the approaches to the bridge (record pp. 27 and 201). Hence, the question, under all the evidence and circumstances in the case, is the claimant entitled to recover damages for the cut stone hauled from his premises which was not used in the construction of the Gilmer bridge? It is to be borne in mind that the state road commission had the right to quarry and remove 1000 cubic yards of stone in consideration of the premises mentioned in the contract, while it only quarried about 500 cubic yards. Out of that amount it placed on top of the fill of surplus waste material from 175 to 225 cubic yards of man stone which was sold as such by the claimant. The cut stone was quarried at considerable expense by w. p. a. labor and claimant received the benefit of surplus waste material and man stone, both of which were of a special and peculiar benefit to him. It would be unfair to the Federal Govermnent furnishing the w. p. a. labor to quarry and cut this stone at great expense, for the state to abandon or give away same. It cannot be seen how such stone could be considered surplus waste material, and since claimant sold man stone from the fill made, it would appear that the fill was made sufficiently high for his purpose. *225 Furthermore, the contract provided for “the removal of stone to point or points of application where needed.” The special and peculiar benefits which the claimant received far exceeded, any damages which he may have sustained.
From the evidence we fail to find any basis of claim for damages pertaining to the fill being made insufficient for the purposes contemplated.
The evidence fails to establish any claim for damages under claimant’s fourth assertion pertaining to waste material being trucked away and used on state road route No. 35. From the evidence it would appear that if the state had quarried its full ^ueta of 1000 cubic yards of stone, there would have been so much surplus waste material that, if anything, claimant would have been justified in objecting to the surplus quantity placed upon his land at the place designated in the contract. From the quantity of stone sold from the fill it would appear that the fill had been made sufficiently high to meet his purpose.
Claimant failed to establish any claim for damages for failure of the road commission to reset fence along quarry site. From the evidence it appears that the fence, was reset where removed. It was not contemplated that the agreement to reset the fence along quarry site would require the commission to build a fence where it had not been torn down, nor at other points not contemplated by the contract in the changes made.
The claimant failed to establish any damage by reason of the failure of the road commission to build a sufficient wall around the spring specified in the contract, or to establish the fact that its usefulness had been lessened or destroyed- From all the evidence and circumstances in the case it would seem that the well drilled at the barn site was the most feasible solution of the lack of water facilities on the premises, and were contemplated when the barn site was planned. There was considerable evidence introduced relative to a verbal agreement that the road commission .agreed to remove a large rock near the *226 spring. However, if this rock had been blasted and moved, it would have by all probability diverted the course of the spring.
The claimant failed to establish by the evidence any claim for damages under his seventh and eighth assertions since it appears from the contract and the circumstances surrounding the making of the fill and the construction of the barn that it was not contemplated between the parties that the fence around the barn lot was to be rebuilt. It further appears from the evidence that claimant consented to the road change made along the quarry. The road was placed on a better grade than the old road running by the quarry (record p. 145).
From all the evidence in the case we conclude that the special and peculiar benefits to the claimant’s farm and quarry, as well as revenues which he derived from the sale of stone from the fill made by the road commission, exceeded all claims for damages that could have been sustained upon any assertion made pertaining thereto, and are therefore of the opinion to deny an award, and an order will be entered accordingly.